## Napier, et al. v. Commonwealth.

(Decided June 5, 1928.)

### Appeal from Leslie Circuit Court.

1.  Criminal Law.—In prosecution for murder, where father of deceased produced on trial shirt which deceased had on when he was shot and gave opinion as to what impression on shirt indicated, held that such testimony was error and prejudicial, where it served to confirm the dying declarations of deceased as related by commonwealth's witnesses, since witness was not an expert, and jury could judge what impression on shirt indicated just as well as witness.

2.  Homicide.—In prosecution for murder, where two brothers were charged with killing deceased, who had seized their sister and had pistol in hand, instruction which gave each of brothers right to defend himself or brother but not to act in defense of sister held error.

J. M. MUNCY and J. L. DIXON for appellants.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—
Reversing.

Monroe Napier and Charley Napier were indicted in the Leslie circuit court for the murder of Milliard Collins.

On the trial of the case Monroe Napier was found guilty of murder and his punishment was fixed at life imprisonment; Charley Napier was found guilty of manslaughter, and his punishment was fixed at ten years' imprisonment. They appeal.

The proof for the commonwealth showed these facts: Eli Collins and his wife were returning from the mill, and met Millard Collins at the mouth of Pig Pen fork on Hell-for-Certain creek. Monroe Napier was with him. They were riding on a mule; Monroe Napier being behind Milliard Collins. They started up the Pig Pen fork. Sallie Napier, a sister of Monroe, was just ahead of them, and Felix Jones and wife ahead of her. Milliard Collins was very drunk. About 150 yards below the house of Eli Collins, Monroe Napier got down off the mule. He called to his mother, Susan Napier, who was with Sallie, "Come here, Ma." She went over to where they were. He then called to Sallie to come back. Collins and wife rode on, but Mrs. Collins said to Sallie as she passed, "If I were you, I would go back and see what he wants." Sallie then started back down the stream. Collins rode on, and when he got about 100 yards farther, but around the bend, he heard three or four shots— "keen crack shots, small like, so fast I couldn't count them." He went on home about 40 yards, took the meal off, turned the mule loose, and went through the kitchen into the lower door of the house. Just then he heard three other shots. These sounded louder than the first shots. Neither he nor his wife went down to see what was the matter, but a few minutes later Martha North went down the creek, and she found Milliard Collins lying on the side of the creek, breathing, but insensible. She screamed for help. Some neighbors came and Collins was taken to a neighboring house, where he died the next morning after making dying declarations. A number of people say this: "He said Monroe shot him, then he would holler for Monroe and say Monroe was his friend." One witness says he said this: "Monroe was riding behind me and jogged the pistol against me and killed me." Another witness says: "I asked him how come the trouble, and he says, 'I never had a word; Monroe jogged the pistol right against my back and fired it.' He said they took the pistol then and shot it out around him" The proof shows, without contradiction, that Napier had a smaller pistol than Collins, and that the

first three shots were not as loud as the last shots. The pistol of deceased was lying near him, with all the loads shot out of it. and he was shot once in the hip, twice in the back near the shoulder blade, one of the balls lodging below the left nipple of his breast. These were the balls of the small pistol.

On the other hand, the proof for the defendants was, in substance, this: After Eli Collins passed, Milliard Collins got down off the mule and went up to Sallie Napier, who was 20 years old, seized her by the arm, and said, "Sallie, by God, I am going to court you or die right here before I leave." Collins was a married man with a wife and three children. Monroe Napier then said to him, "Milliard, turn that girl loose." Sallie was trying to get away from him and her mother, who was nearby, was crying and begging him to turn her loose. Just then Charlie Napier, who had stopped a little way below to fix his saddle, rode up, and Sallie said to him, "Charlie, make Milliard turn me loose." He then asked Milliard to turn her loose, and Milliard turned on him and said with an oath, "I will kill you;" and shot at him. He was on a mule. The mule jumped when the pistol fired, and he fell off the mule in the branch. While he was down in the branch, Milliard Collins fired two more shots at him. He then turned on Monroe and said, with an oath, "I will kill you;" then began to fire on him. After he had shot twice at Monroe, Charlie got up out of the branch, drew his pistol, and shot three shots at Collins while he was shooting at Monroe. He was about five or six feet from him when the shooting occurred. Sallie had gotten loose from him. Collins fell, and the Napiers all went off, leaving him there on the creek.

These facts were, in substance, stated by Monroe Napier, Charles Napier, Sallie Napier, and their mother, Susan Napier, and they were the only witnesses present when the shooting actually took place. Charlie Napier that evening went to the nearest deputy sheriff and surrendered himself, telling the officer that he had killed a man and had to do it. Milliard Collins, Monroe Napier and Charlie Napier had been together the greater part of the day, as they say, electioneering. They had a quantity of whisky with them and drank freely from it.

Joe Collins, the father of the deceased, produced on the trial the shirt which the deceased had on when he was

shot, and testified that it was in the same condition as it was then, and that there were three gunshot holes in it. Then, over the defendants' objection, this followed:

"Q. 32. I will ask you further to tell the jury whether or not you examined the shirt close enough to discover on the back of the shirt any ring or impression made on it? A. Yes, sir.

"Q. Where is that ring or impression made in it? A. In the back of the shirt.

"Q. What does it resemble or appear to be? A. The muzzle of a pistol.

"Q. Why do you think so? A. Because it is exactly like one.

"Q. What does it indicate? A. It looks like the muzzle of a pistol.

"Q. What color is it? A. It is dark, and looks like powder smoke. (At this point the shirt is examined by the jury and offered in evidence, and is made a part of the record in this case.)"

The witness was not an expert. No case was presented for opinion evidence. The defendants' objections should have been sustained. The jury could judge what the impression on the shirt indicated just as well as the witness. The attention of the witness may properly be called to any impression or stain on the shirt and he may state that these were there when the shirt was taken of the deceased, but he may not give his opinion as to what these signs on the shirt indicate. If there was any impression or stain on the shirt when taken off the deceased which is not on it when shown to the jury, the witness may tell what the condition then was and describe it fully, but he may not give his opinion as to how this impression or stain was made.

The opinion of the witness here was prejudicial to the substantial rights of the defendants; for it served to confirm the dying declarations of the deceased as proved by the witnesses for the commonwealth and it may have induced the verdict against Monroe Napier, fixing his punishment at life imprisonment. The weight of the evidence shows that when Eli Collins and wife left them, Monroe Napier had gotten off the mule, and that deceased soon afterwards got off too. The wound from a pistol pressed against his shirt would not perhaps be like that from one fired six feet away.

The defendants also complain that by the instructions of the court no right was given them to act in defense of their sister. The mother, Susan Napier, putting her testimony in narrative form, says this:

"Hiram North's wife come and told me there was some drunk folks down the creek, and I started to meet Sallie. I met her a little piece below where the shooting occurred. Monroe and Milliard was on the mule when I met them, and Sallie and the rest of them was walking. Milliard told Monroe, 'Let's get down and take a drink.' They both got down off the mule. Milliard went and raised the lid up on the saddle pockets, but I don't know whether he pulled a bottle or fruit jar out. Milliard had hold of Sallie's arm. Charlie wasn't by but when he come Sallie says, 'Charlie, make Milliard turn me loose;' and Charlie says, 'Milliard, turn that girl loose, and quit acting a damn fool.' Charlie was on his mule, and Collins fired a shot at Charlie. He turned then and said to Monroe, 'I will kill you, damn you;' and when he fired at Monroe, Monroe fell. Then while he was down Charlie fired three or four shots at Collins. Collins had hold of my daughter with his right arm and shot with his left hand. He fired two or three shots while he was holding to her."

Sallie Napier testifies to the same facts, and says that when they overtook her this first occurred:

"He told me to stop or he would shoot me. I never stopped; I jumped in behind Felix Jones' mule, and he jerked his pistol out, and I started on, and he asked, 'Must I shoot her?'"

She says he followed her on up the branch, and when the shooting occurred "he was a hold of me with his arms, and I was trying to get him to turn me loose, and he wouldn't at all. He said he was going to spark me or court me or die, and he said all kinds of bad talk. I begged him to turn me loose, but he wouldn't."

In the parlance of Eastern Kentucky, the words used by Collins meant that he would have sexual intercourse with her or die. Coming from a married man, they could not well have had any other meaning. The difficulty occurred when she had nearly reached her home and was about to leave the road. Under this proof, there

was some evidence that the defendants had reasonable grounds to believe that their sister was in danger of death or great bodily harm at the hands of the deceased. The court, by its instructions to the jury, gave each of the defendants the right of defense of himself or his brother, but gave them no right to act in defense of their sister, Sallie. This was error. The deceased had not only gotten out his pistol and threatened to shoot her, but with his pistol in his hand had seized and held her, saying he would court her or die, no doubt using the word "court" in its local sense, and had fired his pistol one or more times while so holding her. He was so drunk that no one could be assured as to what he would do next. He had his pistol out, and nothing had occurred to call for its use. There had been no trouble up to this time. Eli Collins and wife were riding fast, and had only gone about 100 yards when the shooting occurred.

Under the evidence for the defendants, the conduct of the deceased toward their sister was the cause of the trouble, and no other cause for it is shown by the evidence. Though the jury may not have believed the evidence for the defendants that Collins fired the first shots, there were facts tending to sustain their testimony as to the conduct of Collins toward their sister, and, if the jury believed this to be true, they might have taken a very different view of the case.

Judgment reversed, and cause remanded for a new trial.